UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

MANAGEMENT CONSULTING GROUP, GmbH,

                                      Civil Action No. 1:22-cv-5851-PKC

                Plaintiff,

        -against-

OPTA GROUP LLC, SPEYSIDE EQUITY LLC,
SPEYSIDE EQUITY FUND LLP, KAY MICHEL,
KEVIN DAUGHERTY, JEFF STONE, OLIVER
MAIER, OPTA MINERALS, INC., SPEYSIDE
PRIVATE FUND ADVISERS LLC, SPEYSIDE
PRIVATE FUND LLP, SPEYSIDE EQUITY 1 LP,
JOHN AND JANE DOE 1-99,

                Defendants.
------------------------------------------------------------------x

## AMENDED COMPLAINT, CLASS ACTION AND JURY DEMAND

Plaintiff Management Consulting Group, GmbH ("MCGM") alleges:

### I.   Class Action

1.     MCGM files this amended complaint as a class action for itself and on behalf of the final shareholders who owned SKW Stahl-Metallurgie Holding AG ("SKW"), a public company traded on the Frankfurt Stock Exchange, until SKW was delisted in 2019.  The Class Members are referred herein as the "Class" or the "Shareholders" or "Class Members".

2.     Excluded from the Class are Defendants, their parent companies, subsidiaries, agents and affiliates, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

1

3.    In removing the case from state court to district court pursuant to 28 U.S.C. § 1332(d)(1)(D), Defendants relied upon the Class Action Fairness Act (CAFA), 28 U.S.C. §§ 1332, 1453, 1711–15, that the class satisfies the requirements to proceed as a class action.

## II.  Nature of Action

4.    A conspiracy was formed by 2016 to against the Shareholders to remove their ownership of SKW.  The members of the conspiracy included SKW CEO Dr. Kay Michel ("Michel") who controlled SKW and Speyside Group.  The plan was  to replace the Shareholders with a company called Speyside Equity LLC (the parent company of the Speyside Group).

5.    The conspiracy planned to keep competitions who expressed interest away, keep the Shareholders who owned SKW in the dark, and take steps to prevent the Shareholders from interfering.

6.    SKW's CEO Dr. Kay Michel controlled SKW as the CEO and sole member and chairperson of the Executive Board.  His background was with private equity firms and not a public company with shareholders.

7.    Speyside Equity LLC was a new private equity firm with offices in New York and Michigan, headed by three partners with experience with doing business in Germany.  They organized other entities using the "Speyside" name for various functions.

8.     SKW posted material financial and business articles, as was required by German law Defendants.  The agreement to get rid of the Shareholders was material, but not disclosed, until after CEO Michel granted Speyside Group rights to control SKW's debts, and to receive a loan reduction of EUR 26 million belonging to SKW.  This agreement was an impediment to third parties and Shareholders to compete with the Speyside Group.

9.      The Shareholders have organized into the Class Members who owned SKW. There are several hundred Class Members and they include residents from the United States, Germany, and other places.  Defendants are U.S. citizens, except for Michel.  The  trade and commerce in New York and Germany implicated is the market in buying and selling companies.

10.      The conspiracy carried out an illegal anticompetitive combination or conspiracy that violates the Sherman Act § 1 which states, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

11.      Speyside has stated that SKW was merged into OPTA Group LLC, a company in New York, and that Defendants continue SKW's business from the United States.

### III. Parties

#### A.  Plaintiff

12.      MCGM is a limited liability company and has an office in Munich, Germany. MCGM provides management consulting services of all kinds at home and abroad as well as acquisition, sale, holding and management services.

13.      In 2015, MCGM purchased 2.5% of the shares in SKW trading on the Frankfurt Stock Exchange.

14.      In 2018, MCGM represented more than 40% of the shares of SKW based on the proxies returned by Shareholders before the shares were diluted and taken from Shareholders.

15.       Dr. Olaf Marx is Managing Director of MCGM.  He was a member of the five-person Supervisory Board of SKW, a board which represented the Shareholders in matters with SKW management.  The Supervisory Board monitored what SKW was doing but had no control

over management except in voting together with all Shareholders at general and special meetings.

16.     All Shareholders met in annual and special meetings and had voting authority at those meetings to elect or discharge management and to make other decisions.

**B.  Defendants**

17.      Dr. Kay Michel ("Michel"), SKW Chief Executive Officer ("CEO"), was the sole member of the Executive Board.  In the position of a one-man CEO and as the one-man Board,   Michel had the authority to negotiate and execute contracts on behalf of SKW AG.  The Shareholders had authority to reject Michel's decisions by voting at general special meetings.

18.     Defendant Speyside Equity LLC:  Speyside is a Delaware limited liability company organized as a limited liability company with an office at 30 East 86th Street, New York, NY 10028, and declares it was founded for:

> Acquisition Solutions. Business Transformation … Speyside Equity makes control investments in middle-market businesses with histories of profitability. Targeted portfolio companies often possess balance-sheet, legal, environmental, labor, or transactional complexity causing financial or operational stress.

> Speyside Equity focuses on creative transaction structures. We are comfortable investing in carve-outs of large multinational companies, industry consolidations, family-owned businesses, bankruptcies and workouts, and other special situations. Target investments typically have revenues of up to $500 million, but we can exceed that range on a case-by-case basis.

> Our senior investment team members have extensive transactional, operations, and turnaround experience from their roles at Speyside and prior positions.

19.     Defendants Kevin Daugherty, Jeff Stone, and Oliver Maier, during the period relevant in this litigation, are described by Speyside as the Senior Team of Speyside Equity as

the three Managing Directors who founded the company. They exercised direct and indirect control in each Speyside Group company.

20.    Kevin Daugherty and Kay Michel knew each other as personal friends before Michel joined to SKW.

21.    Speyside states on its website, "Kevin Daugherty, Founder and Managing Director of Speyside Equity, where he is responsible for sourcing, executing, managing, and exiting investments. Kevin has previously served in operational roles, and he currently serves on the Boards of several of our portfolio companies."

22.    Speyside states on its website, "Jeff [Stone] is a Managing Director of Speyside Equity, an operationally focused, private equity firm, where he is responsible for sourcing, executing, managing, and exiting investments. Jeff has served in both operating roles (as needed) and as a member of the Board of Directors of Speyside Equity portfolio companies."

23.    Websites and news sources report that Oliver Maier was responsible for sourcing, executing, managing, and exiting investments, serving in both operating roles (as needed) and as a member of the Board of Directors of Speyside Equity portfolio companies.

24.    Speyside on its website states its Managing Directors were "responsible for sourcing, executing, managing, and exiting investments and serve as a member of the Board of Directors of Speyside Equity portfolio companies."

25.    Defendant OPTA Minerals, Inc:  OPTA Minerals, Inc. ("OPTA Minerals") was/is a Delaware corporation purchased by Speyside.  When the purchase was closed Speyside Equity described OPTA Minerals as follows:

[A] vertically integrated provider of custom process solutions and industrial mineral products used primarily in the steel, foundry, loose abrasive cleaning, waterjet cutting and municipal water filtration industries. OPTA Minerals has production and distribution facilities throughout Canada and the U.S., as well as locations in France, Slovakia, and Germany.

26.    Although Speyside states that OPTA Minerals was merged into the OPTA Group with SKW, reports on the internet indicate that OPTA Minerals is operating in Canada.

27.    Defendant OPTA Group LLC:  OPTA Group LLC ("OPTA Group") is a Delaware limited liability company organized by Speyside.  It has offices in New York and continues SKW in the United States.

28.    Speyside explains that OPTA Group merged into SKW and OPTA Minerals. Circumstances indicate that this transaction took place on a date after November 2019.

29.    Speyside states in its website:

OPTA Group LLC is the merger of OPTA Minerals and SKW. It is a vertically integrated provider of performance materials solutions and chemicals used in the steel, construction, aluminum, glass, foundry, and water-waste water industries. OPTA Group LLC has production and distribution facilities throughout North America, South America, Europe, and Asia.

30.    Defendant Speyside Private Fund Advisers:  Speyside Private Fund Advisers LLC ("Speyside Private Fund") is a company controlled by Speyside and it controls funds for Speyside Equity transactions.

31.    On February 2, 2016, Speyside Private Fund stated that it is "a special situations buyout firm" and announced, "the closing of Speyside Equity Fund I LP (the 'Fund'), a $130 million buyout fund that will focus on investment opportunities in specialty chemicals, industrials/metal forming & food ingredients businesses."

32.     Defendant Speyside Equity Fund I LP announced on February 2, 2016: "Speyside Equity Fund I LP (the "Fund") that it was fully funded." The Fund was described as a limited partnership which will invest $130 million funds raised by Speyside Private Fund to fund Speyside Equity projects. On the same date (February 2, 2016), Speyside announced that it would complete the acquisition of OPTA Minerals by May 12, 2016.

33.     Various companies, partnerships, and individuals made and not made defendants in this case participated as co-conspirators in the offenses alleged herein and performed acts and made statements in furtherance of a conspiracy.

34.     Whenever this Complaint refers to any act, deed, or transaction of any company, it means that the company engaged in the act, deed, or transaction by or through its officers, directors, employees, agents, or other representatives while they were actively engaged in the management, direction, or control of its affairs.

## IV. Jurisdiction and Venue

35.     This district court has subject matter jurisdiction of the federal law claims pursuant to 28 U.S.C. 28 U.S.C. § 1331, and state law claims pursuant to diversity jurisdiction and supplemental jurisdiction pursuant 28 U.S.C. §§ 1332(d) and 1367(a), and as a class action in which the matter or controversy exceeds $5 million, exclusive of interests and costs.

36.     This Court also has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5 million and at least one Plaintiff or class member is from a state different from one defendant.

37.    This Court has personal jurisdiction over the Defendants because they either directly or through the ownership and/or control of their subsidiaries, among other things: (a) are at home in this district and transact business in this district, including with the assets taken from the Class Members; (b) have substantial aggregate contacts with this district; and/or (c) engaged in an illegal restraint of trade that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.

38.    Defendants engaged in conduct that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

39.    The activities of the Defendants were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.

40.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected trade and commerce discussed below has been carried out in this district, and the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

### IV  Class Action Allegations

41.    Plaintiff brings this action as a class action under FRCP 23 on behalf of itself and all other persons who owned shares of SKW (the "Class") and lost their shares by dilution and cancellation after Speyside Equity was issued shares.

42.     The Class Members are believed to number in the hundreds and are so numerous that joinder of all members, whether otherwise required or permitted, is impracticable.

43.     In removing the case to this district court, Defendants advised that Class Members are much more in the hundreds.  Defendants have examined SKW's records and count more than 1,000 entities and individuals within Plaintiff's proposed class definition.

44.     The names of all Class Members can be ascertained from Defendants' records based on the information they have provided so far.

45.     The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications.

46.     Questions of law or fact common to the Class predominate over any questions affecting only individual members and include:

   a.   Whether Defendants engaged in an agreement, contract, combination, or conspiracy to restrain trade.

   b.   Whether Defendants' conduct caused Class members to receive less than the value of SKW than they would have in the absence of the Defendants' conduct.

   c.   Whether Plaintiff and the other members of the Class were injured by Defendants' conduct, and, if so, the class-wide measure of damages for Class members.

   d.   The need of injunctive relief to which Plaintiff and the other members of the Class are entitled.

   e.   Whether ownership of SKW held by the Class in the form of shares was illegally converted by Defendants into the unauthorized possession of OPTA Group.

   f.   Whether Defendants conspired to embezzle and defraud the Class Members from their property.

9

g.  Whether Defendants published untrue statements of material facts and omitted material facts intentionally or with conscious or reckless disregard of the truth.

h.  Whether Class Members were injured and, if so, the appropriate remedy, including rescission, restitution and/or damages.

47.    Every Class Member owned securities which were an interest in SKW and have the same claims for damages and equitable remedies.  The claims of MCGM are typical of the claims of every Class Members.

48.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class actions and commercial litigation and has no interests that conflict with the interests of the Class.

49.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because of the substantial expense and burden of prosecuting individual litigation.

50.    Therefore, Plaintiff is a member of the Class and may sue as a representative party and the Class should be certified because:

(a) the Class is so numerous that joinder of all members is impracticable.

(b) there are questions of law or fact common to the Class.

(c) the claims of representative parties are typical of the claims of the class.

(d) the representative party will fairly and adequately protect the interests of the class.

(e) Defendants want the Class to be certified.

### V.  Factual Background

### A.  SKW Regularly Posted Good Financial Reports

51.     The law in German and United States requires timely, complete, and honest disclosure of all material financial and other information to the public to protect shareholders and potential investors who may become shareholders from fraud, embezzlement, misrepresentation, and other misconduct.

52.     The German Security Trading Act requires publicly listed companies to publish annual financial statements and a management report, and any material information timely and without delay.

53.     German law also requires companies listed on a stock exchange to timely report all corporate developments that may influence the issuer's financial situation or its business activities which may influence the market price of the corporation.

54.     SKW was listed on the Frankfurt Stock Exchange and its shares were purchased, sold, and held by the public.

55.     SKW was required to disclose to the public all material financial and business material information about SKW.

56.     Material events must be disclosed, and disclosure must be timely, but SKW did not disclose at all about the plan to remove the Shareholders and for Speyside to own SKW.

57.     On January 28, 2014, Michel was appointed Chairman of the Executive Board and CEO of SKW.  In that position, Michel managed SKW for five years until May 31, 2019. For the last three years (2016-2019) of his tenure, Michel was the one member of the Executive Board, and he had sole authority to make decisions.

58.     In January 2015, SKW refinanced and increased a syndicated loan of three banks to EUR 74 million, with a three-year loan maturing in January 2018.  SKW said it was "going to

evaluate the capital markets regarding opportunities for equity capital measures during the further course of 2015."

59.     The syndicated loan had a maximum amount of EUR 84 million, but SKW utilized only EUR 74 million.

60.     In January 2015, Michel said the loan was sufficient, "the stabilization of our financial situation granted by the syndicated loan opens to us the desired headroom for the further development of the Group and possible equity capital measures associated therewith."

61.     In April 2015, however, Michel proposed to double the outstanding SKW shares totaling 6,544,930 to 13,089,860 to increase cash on hand by issuing shares that Shareholders could buy.  Michel explained that SKW had the need for capital for further growth through acquisitions and to redeem outstanding loans.

62.     In October 2015, Michel backed out from increasing shares and capital.

63.     In January 2016, SKW adjusted the financials to cut in half the capital on the books of SKW, ending up in opposite of increasing capital to reducing capital.

64.     In February 2016, SKW reported to Shareholders and the public that over the next three years a program (ReMaKe 2.0) would generate "entirely sufficient" cash for SKW operations.

65.     In March 2016, SKW reported to Shareholders and the public:

    a.  2015 results showed revenues of EUR 285.5 million and an operating EBITDA of EUR 14.8 million, slightly over guidance.

    b.  Revenues and earnings would be adversely impacted by a steel crisis in 2016.

    c.  Revenues expected to rise to roughly EUR 300 million and EBITDA to roughly EUR 20 million in 2017.

d.  General meeting of shareholders was to be held in Munich on May 10, 2016.

66.    In May 2016, SKW published the first quarter financials to the Shareholders the public, detailing its short-term and medium-term financials advising that "SKW … expects to generate an operating EBITDA of up to EUR 20 million in 2017, followed by a further increase in 2018.  This positive earnings development will be made possible above all by the effects of ReMaKe 2.0, [a program to increase profits] which will more than offset the expected continuation of margin erosion and cost increases."

67.    On August 16, 2016, in secret, SKW, OPTA Minerals (owned by Speyside and precursor to OPTA Group), signed a confidentiality agreement ("Confidentiality Agreement") to keep secret a potential transaction for a business combination, that is, a merging with OPTA Minerals.

68.    In September 2016, SKW filed a report reassuring the public that SKW's financial condition of SKW was "continuously positive cash flow":

a.  Full year guidance was confirmed despite a challenging market environment.

b.  An adjusted Q1-2016 EBITDA of EUR 6.8 million.

c.  Continuously positive operating cash flow.

d.  High optimism for conclusion of bank negotiations in September 2016.

69.    On December 15, 2016, SKW reported it had reached a "basic agreement" with "the financing parties of the syndicated loan contract" with the "syndicating lenders", and the banks were flexible on repayment.

70.    SKW published a report advising Shareholders that SKW was expecting to increase cash in 2017 by taking advantage of the subscription rights for the Shareholders and that "[a] corresponding motion was to be presented at a general meeting":

 a.    The syndicating lenders would agree to a standstill on debt maturity until December 31, 2017, to allow for refinancing.

 b.    The cornerstone of this financial restructuring was an extraordinary debt repayment by SKW based on the disposal of assets (mainly non-core activities).

 c.    The syndicating lenders stated their general preparedness to issue a conditional cancelation of debt if the repayment of the debt remaining with the banks was secured by a third party.

 d.    The equity of SKW would be strengthened during 2017 by a substantial capital increase against cash in the amount of at least 100% of the registered capital, with subscription rights for the shareholders and a corresponding motion was to be presented at a general meeting.

71.    This December 2016, plan looked like a SKW return to increase capital and it was the existing Shareholders would receive subscription rights to increase their investments.

72.    The three-point plan in the March 27, 2017, made the Shareholders the source for capital.  The plan was simple:

 a.    Debt redemption by selling assets, primarily of non-core activities.

 b.    The basic willingness of the financing banks to agree to a conditional reduction.

 c.    Substantial cash capital increases by shareholders exercising subscription rights.

73.    On May 24, 2017, consistent with all earlier reports, SKW reported business was so good that the company would "be able to seize opportunities in its core markets … able to increase EBITDA well above the guidance level … revenues approx.. EUR 230 million and operating EBITDA EUR 9 million …."  SKW further advised that business was so good that

SKW announced the general meeting scheduled in July 2017 would be delayed for the purpose of presenting a restructuring plan to Shareholders.

74.    Reports in April 2015, October 2015, December 2016, March 2017, and May 2017 are examples of telling the public in general, and specifically telling the Shareholders, capital was not needed, but if it was needed than shares will be sold to shareholders.

75.    SKW in reports assured and reassured Shareholders, and the public, that SKW's business and finances were sound.

76.    In addition, for three years CEO Michel received proposals from Shareholders to refinance loans and increase capital and Michel did not show any interest.

77.    In July 2017, SKW suddenly stated in its news reports that business was terrible, so bad that Shareholders' shares were worthless.

78.    A sudden change in the financials means SKW was lying and this became clear.

79.    On July 20, 2017, "Speyside Capital" was identified in a monthly report as a company for "further financial restructuring and the strategic development of the SKW Group…[and] to achieve the necessary debt reduction of SKW Stahl-Metallurgie Holding AG, both parties ["Speyside Capital" and SKW] as involved negotiating a conversion of credit claims into equity by means of a debt-to-equity swap".

80.    Speyside was a new name.  It did not loan money to SKW but suddenly SKW points to Speyside who "must" exchange the "debts" SKW "owes" to Speyside for "equity".  A financial reporter in Munich figured it out first.

81.    On July 20, 2017, Michel said, "The term sheet is a breakthrough." … "The management board is now striving to reach an agreement."

82.    The annual meeting of Shareholders was scheduled for August 2017.  Michel stated that the report was coming out, the "final agreement with Speyside Capital … [and] … Final terms and conditions for an enduring financial restructuring shall be submitted to a subsequent stockholders meeting."  Shareholders could vote against Michel.

83.    However, no meeting was held although it would have been the annual meeting for the Shareholders.  Michel canceled this meeting and two others.  No vote was held.

84.    The Shareholders were pushed aside.  SKW was made Speyside as its owner and SKW moved to New York.  Then SKW was merged into OPTA Minerals creating "OPTA Group, LLC" in New York which owns and manages SKW's business.

**B,  Shareholders Stripped of Their Property**

85.    For more than 50 years SKW was listed, and its shares were traded on the Frankfurt Stock Exchange.

86.    By February 2019, SKW had taken possession of the Shareholders' shares,  issued shares to Speyside, and delisted SKW on the stock exchange.

87.    SKW took possession of the Shareholders' shares by first issuing enough shares to Speyside to dilute the Shareholders' 100% equity to 0%.

88.    Speyside directed Michel to place SKW into an insolvency proceeding where they falsely represented that SKW was insolvent.

89.     SKW was not insolvent.  The monthly and other reports published by SKW did not show SKW was as insolvent or becoming insolvent.

90.    The monthly publications claimed SKW was financially healthy, and its business was growing.  The SKW publications regularly posted showed investment plans in which Shareholders would invest if needed.

91.    From 2015 to 2017, Shareholders proposed investment and financial changes which would have increased SKW's funds for operations, including:

    a.    In April 2015, the SKW Shareholders voted to double the shares outstanding, shares which Shareholders would purchase to increase capital.  Michel would not execute this vote.

    b.    On August 1, 2016, MCGM, as a member of a supervisory committee representing shareholders, sent a joint letter of intent with Quirin Bank to refinance SKW's debt with terms to amortize the debt.  Michel did not act.

    c.    On October 6, 2016, MCGM proposed use of authorized capital and issuance of a backstop guarantee in a Letter of Intent by Monaco Resources Group (MRG) and Metalcore.  The guarantee provided for issuing new shares to increase in capital.

    d.    On February 22, 2017, after Michel disclosed the plan with Speyside, MCGM provided a Letter of Intent in which MCGM provided for the mandatory acquisition of new shares for a capital increase in the financial restructuring of the SKW, with the Shareholders, Monaco Resources Group and Metalcorp.

    e.    On March 17, 2017, MCGM offered in a Preliminary Proposal of a mandatory binding offer for acquisition of new shares as a backstop to increase the capital of SKW with the company MRG/Metalcorp in the context of a financial restructuring.

     f.   On September 25, 2017, MCGM and Robus Capital Management Limited would refinance the existing debt would be refinanced in transferring shares from a syndicated loan agreement with MCGM.

92.     In addition to proposals MCGM participated in, there were other efforts from other investors/shareholders which were rebuffed.

93.     On a date unknown, Speyside announced that SKW had been merged into OPTA Group LLC, a new company owned by Speyside.

## IV.  CLAIMS FOR RELIEF

### FIRST CLAIM
### VIOLATION OF ANTIRUST LAWS

94.     Plaintiff realleges and incorporates by reference ¶¶ 1 through 93 above.

95.     Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.  Every person who shall make any contract or engage in any combination or conspiracy is illegal.  *See* 15 U.S.C. § 1.

96.     Section 1 of the Sherman Act prohibits unreasonable restraints of trade. The elements are (1) concerted activity, (2) unreasonable restraint, and (3) effect on interstate commerce or foreign trade.

97.     Where two or more persons agree only one will submit a bid, then there has been an unreasonable restraint of trade, contracts, or combinations which would restrain, or suppress the prices paid to the Shareholders for their shares of SKW, those persons have violated the Sherman Act.

98.     Defendants entered into understandings or agreements which caused third parties from financing and acquiring ownership of SKW from the Shareholders, including, but not limited to, banks, financial organizations, and the Shareholders.

99.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other Class Members have been and will continue to be injured in the loss of their business and property in ownership and revenues of SKW.

100.    As a result, Plaintiff and other Class Members were damaged in the approximate amount of at least $150 million, the actual amount to be determined by a jury, and which to be trebled to $450 million under 15 U.S.C. § 15, which states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees.

## SECOND CLAIM
## RICO, LAUNDERING AND MOVING MONEY

101.    Plaintiff realleges and incorporates by reference ¶¶ 1 through 100 above.

102.    Racketeering is the act of acquiring a business through illegal activity, and/or operating a business with illegally derived income, and/or using a business to commit illegal acts.

103.    RICO is a federal statute which applies extraterritorially where the extraterritorial conduct is predicate to the RICO elements.

104.    In 18 U.S.C. § 1961(1) "racketeering activity" is defined by referring to various federal criminal statutes to serve as predicates for RICO liability.

105.    Predicates include 18 U.S.C. § 1956 (laundering transaction) and § 1957 (engaging in a monetary transaction) are RICO civil violation.

106.    SKW was a business in Munich for half a century and was a reporting public company with its business and finances transparent.  By delisting, leaving for New York, and merging into a private company, reporting nothing, SKW would be out of the reach of the European antitrust enforcers.

107.    For example, the last accounting information during the insolvency proceeding shows that, although Speyside is supposedly the buyer of SKW, Speyside is credited for approximately EUR 72.0 million by February 2018 which appears to be pledges by SKW and the EUR 26 million reduction of SKW's gifted to Speyside.

108.    A RICO claim has four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  The (1) conduct is the violations of 18 U.S.C. §§ 1956, 1957; (2) the enterprise is the Speyside Group, its three owners, and CEO Michel as one enterprise, (3) who the racketeering secretly carried out the plan to push Shareholders out of ownership, and (4) take over SKW and move SKW to New York and mix it into another company.

109.    Any person injured in his business or property by reason of a violation of section 1962 may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee,

110.    As a result, Plaintiff and Class Members were damaged in the approximate amount of at least $150 million, the actual amount to be determined by a jury, to be trebled to $450 million because any person who shall be injured in his business or property may sue for treble damages, prejudgment interest, and costs of suit, including attorney fees.

### THIRD CLAIM
### CONVERSION BY OPTA GROUP

111.    Plaintiff realleges and incorporates by reference ¶¶ 1 through 110 above.

112.    The tort of conversion is established when one who owns and has a right to possession of personal property proves that the property is in the unauthorized possession of another who has acted to exclude the rights of the owner.

113.    The elements of conversion are (1) plaintiff's possessory right or interest in certain property and (2) defendant's dominion over the property or interference with it in derogation of plaintiff's rights.  A plaintiff need only allege and prove that the defendant interfered with plaintiff's right to possess the property. The defendant does not have to have taken the property or benefitted from it.

114.    A demand for the property from a defendant is necessary in certain circumstances. So long as a defendant is in possession of the property in issue under circumstances which might have made that possession lawful or unlawful at its will, a demand by plaintiff for the property and the refusal by defendant are necessary to establish a wrongful transfer and conversion.

115.    No demand is necessary where title in the property in issue is in violation to the rights and title of plaintiff there is a taking and a distinct conversion and no demand is needed.

116.    Defendants conspired to take ownership and possession of SKW stock and assets away from the Shareholders and/or aided and abetted SKW/Michel to take possession of the stock away from Shareholders and transfer rights and title to Speyside Equity and OPTA Group.

117.     Plaintiff made the demand on July 1, 2022, to turn over all shares of stock and property to the Class and must be turned over because the rights of the Class Members are superior to any claims OPTA Group may claim.  Defendants responded on July 8, 2022, claiming OPTA considers the demand for a turnover did not have any basis in fact or law.

118. Defendants and their co-conspirators interfered with Shareholders' possessory rights and interest taking them away. Shareholders are entitled to have their property restored to them or for equivalent restitution.

## FOURTH CLAIM
## EMBEZZLEMENT BY ALL DEFENDANTS

119. Plaintiff realleges and incorporates by reference ¶¶ 1 through 115 above.

120. Embezzlement is when a person or entity intentionally misappropriates the assets entrusted to them. In this type of fraud, the embezzler attains the assets lawfully and has the right to possess them, but the assets are then used for unintended purposes.

121. Defendants conspired to embezzle and/or to aid and abet SKG/Michel to embezzle SKG's property to transfer to Defendants and in the end to OPTA Group.

122. Defendants conspired and/or aided and abetted SKW to embezzle the assets of SKW.

123. The Class Members, who are the former Shareholders of SKW, incurred damages to be determined at trial but not less than EUR 150 million.

## FIFTH CLAIM
## BREACH OF CONTRACT BY OPTA GROUP LLC

124. Plaintiff realleges and incorporates by reference ¶¶ 1 through 123 above.

125. Defendant OPTA Group LLC is the surviving company of a merger with SKW and liable for SKW's wrongs.

126. Dr. Kay Michel controlled SKW before the merger. One of Kay's jobs was to schedule shareholder meetings. There were one thousand, perhaps two thousand Shareholders,

and there always was at least one general meeting per year and there were special meetings on issues the Shareholders decide by voting.

127.    The Michel/Speyside plan was to get rid of Shareholders and Michel refused to hold a meeting to stop the plan.

128.    Under New York law, the elements of a breach of contract are (1) the existence of a relationship and Michel had an employment contract; (2) misconduct and Michel refused to carry out the administrative duty of calling a meeting; and (3) the damages caused was the loss of the ownership of SKW.

129.    As a result, the Class Members lost ownership of SKW and damages to be determined at trial but not less than EUR 150 million.

## SIXTH CLAIM
## FRAUD BY ALL DEFENDANTS

130.    Plaintiff repeats and realleges alleged from paragraphs 1 to 129.

131.    Fraud is established by the withholding of material information, deliberate misrepresentations, and/or deceptions.  One party deceives another by misrepresenting information, facts, and figures.

132.    Securities fraud is an illegal activity carried out with securities to profit at the expense of others.

133.    Defendants and SKW conspired to prevent Class Members from learning about the Michel/Speyside plan to grab ownership of SKW away from Class Members.

134.    As a result, the Class Members lost their property and incurred damages to be determined at trial but not less than EUR 150 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants on each claim and

awarded by the Court:

A.  On the First Claim Against Defendants, treble damages for violation of the Sherman

Act to be determined at trial but not less than EUR 450 million.

B.  On the Second Claim Against Defendants, treble damages for violation of the RICO

Act to be determined at trial but not less than EUR 450 million.

C.  On the Third Claim against Defendant OPTA Group LLC to restore ownership to the

Class Members or award the value of the converted property plus special damages

incurred by the conversion.

D.  On the Fourth Claim, damages incurred by Defendants for embezzlement to be

determined at trial but not less than EUR 150 million.

E.  On the Fifth Claim, damages of EUR 150 million caused by SKW now merged into

OPTA Group LLC, preventing the Class Members from voting against the

Michel/Speyside plan.

F.  On the Sixth Claim, damages against Defendants caused by fraud to be determined at

trial but not less than EUR 150 million.

G.  Prejudgment interest, costs, and disbursements and for such other relief as the Court

deems just.

Dated: New York, New York
       September 15, 2022

STAMELL & SCHAGER, LLP

By: */s/ Jared B. Stamell*
Jared B. Stamell
Andrew R. Goldenberg, Of Counsel
260 Madison Ave. FL 16
New York, New York 10016
(917) 774-7027
stamell@ssnylaw.com
goldenberg@glawnyc.com

*Attorneys for Plaintiff*


## JURY DEMAND

Plaintiff demands for itself and Class Members a jury trial of all issues triable by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

STAMELL & SCHAGER, LLP

By: */s/ Jared B. Stamell*
Jared B. Stamell

*Attorneys for Plaintiff*