UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
MCGM, GmbH,

                        Plaintiff,                      22-cv-5851 (PKC)

         -against-                    OPINION AND ORDER

OPTA GROUP LLC, SPEYSIDE EQUITY LLC,
SPEYSIDE EQUITY FUND LLP, KAY
MICHEL, KEVIN DAUGHERTY, JEFF STONE,
OLIVER MAIER, OPTA MINERALS, INC.,
SPEYSIDE PRIVATE FUND ADVISERS LLC,
SPEYSIDE PRIVATE FUND LLP, SPEYSIDE
EQUITY 1 LP and JOHN AND JANE DOE 1-99,

                      Defendants.
---------------------------------------------------------------x

CASTEL, Senior District Judge.

        In a Fourth Amended Complaint (the "Complaint"), plaintiff MCGM GmbH, a

shareholder of SKW Stahl-Metallurgie Holding AG ("SKW"), brings claims of conspiracy to

commit common law fraud, promissory estoppel, "conveyance without consideration" and

conversion against eleven named defendants or entities and 99 Doe defendants.  The action was

commenced in Supreme Court, New York County and removed to this Court by defendants

invoking subject matter jurisdiction premised on the Class Action Fairness Act ("CAFA").  28

U.S.C. § 1332(d).

        Five of the defendants, OPTA Group LLC, OPTA Minerals Inc., Speyside Equity

Fund 1 LP, Jeffrey Stone and Oliver Maier, move to dismiss the Complaint for failure to state a

claim.  The moving defendants, excluding OPTA Group LLC, also move to dismiss for lack of

personal jurisdiction.

The Complaint describes the purported malfeasance of defendant Kay Michel, a former CEO of SKW who allegedly failed to address the company's funding needs and drove it to insolvency.  Michel, according to the Complaint, "lives in Germany beyond the jurisdiction of this federal court."  (Compl't ¶ 53(f).)  A court in Munich, Germany presided over insolvency proceedings for SKW, adopted an insolvency plan that described SKW's shares as "economically worthless" and directed "an uncompensated compulsory transfer of shares" to an entity that is not a party to this action.

Because the Complaint does not plausibly allege a claim for relief against any of the moving defendants, their motion to dismiss for failure to state a claim will be granted.  The Court need not reach the issue of personal jurisdiction.

BACKGROUND.

Non-party SKW was a German public company with approximately 2,000 shareholders, whose shares traded on the Frankfurt Stock Exchange.  (Compl't ¶ 3.)  SKW had 24 subsidiaries and was the world's largest supplier of chemical products used to manufacture steel.  (Compl't ¶¶ 4-5.)  As of July 2018, its operating value was EUR 222.3 million.  (Compl't ¶ 5.)

Plaintiff MCGM was SKW's largest shareholder, with 2.5% of the Company's shares.  (Compl't ¶ 27.)  According to MCGM, defendant Michel used his authority as SKW's Chief Executive Officer to secretly arrange for the acquisition of SKW by defendant Speyside Equity, LLC ("Speyside"), a private-equity firm managed by Michel's personal friend, defendant Kevin Daugherty.  (Compl't ¶¶ 6-8.)  The Complaint alleges that after SKW took out a three-year loan of EUR 84,000,000 in 2015 (the "2015 Loan"), Michel failed to adequately maintain the Company's cashflow or arrange for the loan's refinancing, and instead pursued secret

negotiations to sell SKW to Speyside.  (Compl't ¶¶ 80-102.)  During this time, SKW's public statements allegedly misrepresented the strength of the Company's finances and failed to disclose SKW's negotiations with Speyside.  (See id.)

On July 20, 2017, SKW announced that the lenders on the 2015 Loan had agreed to assign the loan to defendant Speyside Private Fund Advisers LLC, a "sister company" of Speyside, and that the Company would exchange the loan in a debt-to-equity swap that plaintiff asserts "squeez[ed]" existing shareholders out of ownership.  (Compl't ¶¶ 103-05, 108.) According to the Complaint, the transaction occurred even though SKW had other options for refinancing the 2015 Loan and meeting the company's cashflow needs, including through a proposal made by MCGM and an aborted 2015 plan to increase liquidity by issuing new shares to existing shareholders.  (Compl't ¶¶ 83-84, 93-94, 97-99.)

The Complaint acknowledges that the transaction between SKW and a Speyside entity occurred pursuant to an insolvency plan ordered by a court in Munich, Germany.  In September 2017, SKW "open[ed] insolvency proceedings for its assets due to over-indebtedness."  (Compl't ¶ 21.)  Insolvency proceedings occurred in the Insolvency Division of the District Court of Munich, Germany.  (ECF 65-1.)  The German court issued a 17-page, single-spaced opinion that observed that "[t]he insolvency plan . . . provides for an uncompensated compulsory transfer of the shares to the investor Speyside S.à.r.l. by way of the securities transaction clearing system and an exclusion of the right of the existing shareholders to subscribe to the newly issued shares of the Debtor."  (Id. at p. 11.)  "The shares of the previous shareholders must . . . be regarded as economically worthless in the insolvency plan procedure and valued at EUR 0.00 per share."  (Id.)  The German court stated that "the insolvency of the holding company threatens to infect the subsidiaries, which would lead to a further deterioration

of the enterprise value" and described the insolvency plan's effect on shareholders such as

MCGM:

> The shareholders are therefore in all likelihood not placed in a worse position as a result of uncompensated transfer of their rights and claims resulting from the shareholding than the position in which they would be situated without the plan. In both procedures (insolvency plan procedure and regular procedure), no payments to the shareholders are possible and are also not provided for under the law.

(Id.)[1] The Complaint states that "[a]s a result of the insolvency plan, the Shareholders were

replaced with Speyside, and/or a Speyside affiliate and finally [SKW] was merged into [OPTA]

in New York." (Compl't ¶ 24.)

The Complaint brings four claims for relief. Count One asserts "fraud against co-

conspirators," and asserts that "[a]t least ten persons and entities agreed to a transaction who

planned and were able to succeed to remove the Shareholders as owners of SKW AG." (Compl't

¶¶ 124-33.) Count Two asserts promissory estoppel "against Speyside or a Speyside controlled

company (for example, OPTA Group LLC) . . . ." (Compl't ¶¶ 134-40.) Count Three asserts

"conveyance without consideration" against Speyside and/or OPTA. (Compl't ¶¶ 141-46.)

Count Four asserts a conversion claim against OPTA. (Compl't ¶¶ 147-54.)

While the Complaint includes some allegations describing OPTA's role in these

underlying events, the other four moving defendants are rarely mentioned. Jeff Stone and Oliver

Maier are identified as members of Speyside's "Senior Team" who allegedly "controlled

Speyside and related affiliate companies." (Compl't ¶ 33.) Stone is alleged to be a managing

---

[1] A separate Order of the German court similarly observed: "The insolvency plan is intended to achieve a substantial debt reduction of [SKW]. For this purpose, the insolvency plan stipulates that all shares in the corporation are transferred to Speyside S.a.r.l. and that the capital stock, which is to be reduced to EUR 0 by way of simplified capital reduction, is increased to EUR 1 million by way of a combined cash and in kind capital increase." (ECF 65-2, at p. 2.)

director of Speyside.  (Compl't ¶ 35.)  No title is given for Maier, who is identified as

"responsible for sourcing, executing, managing, and exiting investments" and a director of

unspecified Speyside portfolio companies.  (Compl't ¶ 36.)  OPTA Minerals, Inc. "was or is" a

corporation purchased by Speyside, allegedly for the purpose of later acquiring SKW.  (Compl't

¶ 38.)  Although it is not entirely clear from the Complaint, it appears that after OPTA Minerals,

Inc. acquired SKW, it became defendant OPTA.  (See Compl't ¶ 53(c)-(d).)  Speyside Equity 1

LP is described as follows:

> Defendant Speyside Equity Fund 1 LP ("Speyside Equity I")
> announced on February 2, 2016: "Speyside Equity Fund I LP (the
> "Fund") that it was fully funded." The Fund was described as a
> limited partnership which will invest $130 million funds raised by
> Speyside Private Fund to fund Speyside Equity projects.

(Compl't ¶ 45.)  According to the Complaint, Speyside Equity 1 LP entered into a confidentiality

agreement with OPTA Minerals in June 2015, and in April 2016, Speyside acquired OPTA

Minerals by "us[ing] its sister company, Speyside Equity 1, to own OPTA Minerals."  (Compl't

¶ 69.)  All of these defendants urge that the Complaint does not plausibly state a claim for relief

against them.

       As noted, subject matter jurisdiction is premised on CAFA.  This action was

originally filed in the New York Supreme Court, New York County, and removed by OPTA.

(ECF 1.)  The Notice of Removal and the Complaint contain numerous legal errors about the

citizenship of limited liability companies, which "take[] the citizenship of all of [their]

members."  Agoliati v. Block 865 Lot 300 LLC, 2023 WL 405769, at *2 (2d Cir. Jan. 26, 2023)

(quotation marks omitted) (summary order).  However, CAFA requires only "minimal diversity,"

which is satisfied where "any member of a class of plaintiffs is . . . a citizen or subject of a

foreign state and any defendant is a citizen of a State . . . ."  28 U.S.C. § 1332(d)(2)(B).  The

Notice of Removal states that two putative class members are citizens of Austria.  (ECF 1 at ¶ 16.)  The body of the then-operative complaint identified OPTA Minerals, Inc. as a defendant incorporated in Delaware; no principal place of business was alleged.  (ECF 1-13 at ¶ 10.)  Notwithstanding the numerous defects in the parties' citizenship allegations, the Court concludes that it had subject matter jurisdiction under CAFA at the time of removal based on the foreign citizenship of two putative class members and the Delaware citizenship of a defendant.

MOTION TO DISMISS STANDARD.

   To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth.  Iqbal, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

   The parties' Rule 12(b)(6) submissions annex certain agreements and the defendants also rely on the Orders of a German court that are provided in a certified translation. "Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered.  In addition, even if not attached or incorporated by reference, a document upon which the complaint solely relies and which is integral to the

complaint may be considered.  Courts may also properly consider matters of which judicial notice may be taken." Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc., 697 F.3d 59, 64 n.4 (2d Cir. 2012) (citations, quotation marks and ellipsis omitted).  A court may properly take judicial notice of a foreign court decision, including to establish the facts of the litigation and the opinions stated therein, without assuming their truth.  Ermini v. Vittori, 758 F.3d 153, 156 n.2 (2d Cir. 2014); Atas v. New York Times Co., 2023 WL 5715617, at *3 (S.D.N.Y. Sept. 5, 2023) (Oetken, J.).  The Court may not properly consider a testimonial affidavit that makes factual assertions without converting the motion into one for summary judgment.  See, e.g., Friedl v. City of New York, 210 F.3d 79, 83-84 (2d Cir. 2000).  There is no need to catalog every exhibit filed in connection with this motion, but the Court notes that it has considered a limited number agreements, each of which is referenced in the Complaint, and two Orders of a German court that are properly subject to judicial notice.

        As noted, four of the five defendants have moved to dismiss for lack of personal jurisdiction.  Typically, where a defendant move for dismissal on jurisdictional grounds, a court must decide the jurisdictional issue before addressing whether the complaint plausibly state a claim for relief.  See In re Rationis Enterprises, Inc. of Panama, 261 F.3d 264, 267-68 (2d Cir. 2001); Chevron Corp. v. Naranjo, 667 F.3d 232, 247 n.17 (2d Cir. 2012) ("Ordinarily, [courts] would address any challenge to personal jurisdiction prior to deciding the merits of the cause of action.").  "However, in cases such as this one with multiple defendants – over some of whom the court indisputably has personal jurisdiction – in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants.  This is particularly true when the

personal jurisdictional challenges are based on factual allegations that are, in this early posture, still under development."  Id.

Here, OPTA does not dispute the Court's personal jurisdiction over it, and all defendants urge that the Complaint does not plausibly state a claim for relief against them. Because the Complaint does not plausibly state a claim for relief against any of the movants, the Court need not reach their arguments directed to personal jurisdiction.

DISCUSSION.

I.      ALL CLAIMS AGAINST OPTA MINERALS
        INC. ARE VOLUNTARILY DISMISSED.

In its response to defendants' motion, under the heading "Opta Minerals Inc. is Not Needed," MCGM states as follows: "Defendants intend to drop the full name of a company. Opta Minerals Inc. is not Opta Mineral Group LLC.  Opta Minerals Inc. is dropped."  (Pl. Mem. at 22.)  The Court understands MCGM to be stating that it no longer will proceed with any claim against OPTA Minerals Inc.

All claims against OPTA Minerals Inc. will be dismissed with prejudice.

II.     THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT THE
        MOVANTS PARTICIPATED IN A CONSPIRACY TO DEFRAUD.

Count One is labeled as a claim of "Fraud Against Co-Conspirators."  (Compl't ¶¶ 124-33.)  It recites the legal elements for fraud and of civil conspiracy, and states, "At least ten persons and entities agreed to a transaction who planned and were able to succeed to remove the Shareholders as owners of SKW AG."  (Compl't ¶¶ 125-27.)  The Complaint asserts that because SKW was a public company in Germany, SKW and Michel had an obligation under German law to disclose four documents relating to Speyside's acquisition of SKW: two term sheets, a Subscription and Contribution Agreement entered into by SKW and Speyside, and an

agreement executed by SKW, Speyside and eight non-party entities.  (Compl't ¶¶ 128-29.)  It states that Michel and Speyside withdrew SKW funds for their own use, and that Speyside's acquisition of SKW was unnecessary because SKW had other options for refinancing the 2015 Loan.  (Compl't ¶¶ 130-33.)

Under New York law, "[t]he elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages."  Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559 (2009).  "Where the claims are premised on allegations of fraud, the allegations must satisfy the heightened particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure."  In re IBM Arb. Agreement Litig., 76 F.4th 74, 87 (2d Cir. 2023) (quotation marks omitted).  "[I]n order to comply with Rule 9(b), the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Id. (quotation marks omitted).

 "To establish a claim of civil conspiracy, the plaintiff must demonstrate the primary tort, plus the following four elements: an agreement between two or more parties; an overt act in furtherance of the agreement; the parties' intentional participation in the furtherance of a plan or purpose; and resulting damage or injury."  Cohen Bros. Realty Corp. v. Mapes, 181 A.D.3d 401, 404 (1st Dep't 2020).  Conspiracy allegations are not scrutinized under Rule 9(b), and instead are subject to Rule 8(a): "On its face, Rule 9(b) applies only to fraud or mistake, not to conspiracy.  [The] pleading of a conspiracy, apart from the underlying acts of fraud, is properly measured under the more liberal pleading requirements of Rule 8(a).  Even so, the complaint must allege some factual basis for a finding of a conscious agreement among the

defendants."  Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 26 n.4 (2d Cir. 1990) (internal citations omitted).

For the purposes of this motion, the Court assumes arguendo that the Complaint adequately alleges fraudulent conduct by Michel, but grants the motion to dismiss because it does not plausibly allege that any of the moving defendants entered into an agreement with Michel to commit an act of fraud.

The fraud claim is focused on the actions of Michel, non-party SKW and Speyside, and specifically relates to Michel's purported obligations to disclose four agreements related to SKW and Speyside.  (Compl't ¶¶ 124-33.)  The Complaint's allegations about Stone and Maier are limited to their job titles and descriptions of their responsibilities contained on a Speyside website.  (Compl't ¶¶ 33, 35-37.)  The allegations related to Speyside Equity 1 LP describe background information about Speyside's acquisition of the now-dismissed OPTA Minerals.  (Compl't ¶¶ 67, 69.)  Drawing every reasonable inference in favor of MCGM, the Complaint does not plausibly allege an agreement by Stone, Maier or Speyside Equity 1 LP to conceal any information from MCGM or to evade Germany's disclosure laws.

As to OPTA, the Complaint asserts that in August 2016, SKW and the now-dismissed OPTA Minerals entered into a confidentiality agreement "to keep secret the business combination with SKW AG, that is, merging with OPTA Minerals."  (Compl't ¶ 92.)  Assuming that MCGM is seeking to hold OPTA liable for the actions of its apparent predecessor, OPTA Minerals, this confidentiality provision provided that the agreement "shall not restrict any disclosure or retention by either Party required by law . . . ."  (ECF 78-1, § 7.)  The agreement, which has been submitted by MCGM, is properly considered on a Rule 12(b)(6) motion because it is incorporated by reference into the Complaint.  See Garanti, 697 F.3d at 64 n.4.  Rather than

supporting the plausibility of a purported conspiracy to defraud, the agreement reflects that OPTA agreed to the disclosure of all information required by law.  The fraud claim centers on the actions of Michel and his purported obligations under German law, and does not identify an agreement with OPTA to evade a disclosure obligation.  See Cohen Bros., 181 A.D.3d at 404.

The motion to dismiss Count One against the four moving defendants will be granted.

## III.   THE COMPLAINT DOES NOT ALLEGE A PROMISSORY ESTOPPEL CLAIM AGAINST ANY MOVING DEFENDANT.

Count Two is labeled "Promissory Estoppel Against Speyside Controlled Company," and asserts that Michel acted as an alter ego of either Speyside or a company controlled by Speyside.  (Compl't ¶¶ 134-40.)  The Complaint asserts that in 2015, Michel told SKW shareholders that the Company needed to increase capital, and asked shareholders to vote "to increase capital by acquiring new shares."  (Compl't ¶ 136.)  The shareholders approved the proposal, but Michel never offered new shares in the Company.  (Compl't ¶¶ 136-37.)  Michel publicly stated that SKW would issue new shares as needed, but later announced that Speyside would be refinancing the 2015 Loan, and that Speyside would purchase new SKW shares and "get rid of the Shareholders' ownership."  (Compl't ¶¶ 137-38.)  The Complaint states: "Michel was acting for himself and as alter ego of Speyside or a Speyside controlled company (for example, OPTA Group LLC) and they are liable for damages to the Shareholders . . . ." (Compl't ¶ 140.)

"The elements of a claim for promissory estoppel are: (1) a promise that is sufficiently clear and unambiguous; (2) reasonable reliance on the promise by a party; and (3) injury caused by the reliance.  Detrimental reliance is an indispensable element of a promissory estoppel claim, and a failure to adequately plead that element requires dismissal."  Schroeder v.

Pinterest Inc., 133 A.D.3d 12, 32 (1st Dep't 2015) (quotation marks and internal citations omitted).  To allege detrimental reliance, the complaint must include facts "showing that plaintiffs did something, or refrained from doing something, in reliance" on the defendant's promise.  Id.

       The Complaint does not identify a clear and unambiguous promise by Michel or detrimental reliance by MCGM.  The Complaint asserts that in April 2015, Michel "proposed to increase the capital of [SKW] by doubling the outstanding [SKW] shares . . . and issuing the new shares for shareholders to buy."  (Compl't ¶¶ 14, 83.)  The shareholders voted to approve the proposal on June 9, 2015.  (Compl't ¶ 15.)  In October 2015, Michel "reversed" the proposal, stating that there was no need for an increase of capital.  (Compl't ¶¶ 16-17, 84.)  Later, in December 2016, "SKW told Shareholders" that it expected to increase cash in 2017 "by taking advantage of the subscription rights for the Shareholders" and would present a motion at a general meeting.  (Compl't ¶ 96.)

       In response to defendants' motion, MCGM states, "First, asking, proposing, requesting and there may be other words, probably in German, for a company to start the process for issuing shares and raising capital.  It is a promise because Michel has the right to schedule a meeting, although if Michel will not schedule, the shareholders could get a court to order one.  Michel followed these practices to June 2015."  (Opp. Mem. at 25.)  Michel's purported "right" to schedule a shareholder meeting is not a promise to that he would do so.  MCGM also points to Michel's decision of October 2015, stating that "no shares were issued and instead of issuing shares, Speyside advised Michel on the acquisition of SKW, wanted SKW to use the over indebtedness to claim to an insolvency and renaming Speyside's debt as capital, a ploy to claim shares."  (Id. at 25-26.)  This argument does not identify a "clear and unambiguous" promise.  As

to detrimental reliance, MCGM states, "Michael was managing by saying 'wait on issuing shares'.  Later in 2017 there was no time to increase the capital by issuing the new shares as Michel promised."  (Id. at 26.)

MCGM's allegations and arguments in opposition underscore its displeasure with Michel's management of the Company but they do not identify a promise or detrimental reliance. The Complaint describes a proposal by Michel to raise capital for SKW by increasing the number of Company shares and offering them for purchase by existing shareholders.  It does not describe an express promise to undertake any course of action.  MCGM also does not describe how it relied on any such a promise to its detriment.

The claim is separately dismissed because it does not include facts that plausibly allege that any Speyside-related entity was an alter ego of Michel.  "In order to state a claim for alter-ego liability plaintiff is generally required to allege 'complete domination of the corporation in respect to the transaction attacked' and 'that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.'"  Baby Phat Holding Co., LLC v. Kellwood Co., 123 A.D.3d 405, 407 (1st Dep't 2014) (quoting Matter of Morris v. New York State Dept. of Taxation & Fin., 82 N.Y.2d 135, 141 (1993)) (bracketed text omitted).  Plaintiffs asserting alter-ego liability must allege "facts to support the conclusion that any domination or control of defendant entities took place, who allegedly controlled these entities, and how such control caused them damage."  S.M. v. Madura, 223 A.D.3d 486, 487 (1st Dep't 2024).

"At the pleading stage, a plaintiff must do more than merely allege that [defendant] engaged in improper acts or acted in 'bad faith' while representing the corporation. The plaintiff must adequately allege the existence of a corporate obligation and that defendant exercised complete domination and control over the corporation and abused the privilege of

doing business in the corporate form to perpetrate a wrong or injustice." Cortlandt St. Recovery Corp. v. Bonderman, 31 N.Y.3d 30, 47-48 (2018) (quotation marks and internal citations omitted).  Relevant facts going toward an individual's domination and control over a corporation may include whether that individual pays the corporation's bills, purported to have a personal interest in the corporation, transferred corporate assets for personal use without consideration, exercised hiring and firing authority, and was an authorized signatory of the company's bank account.  See Berisha v. 4042 E. Tremont Café Corp., 220 A.D.3d 608, 609 (1st Dep't 2023). Conclusory allegations of domination or control do not plausibly allege alter ego status.  See, e.g., 245 E. 19 Realty LLC v. 245 E. 19th St. Parking LLC, 223 A.D.3d 604, 608 (1st Dep't 2024).

Drawing every reasonable inference in favor of MCGM, the Complaint does not make any allegation that would tend to show that Michel exercised domination and control over any Speyside entity.  The Complaint alleges that Michel was a longtime friend of a Speyside managing director, defendant Daugherty.  (Compl't ¶¶ 7, 34, 65.)  It alleges that Speyside and Michel undertook "financial manipulation" to acquire SKW.  (Compl't ¶ 108.)  It also alleges that "[m]oney was withdrawn from [SKW] for Michel himself (between EUR 5 million to 10 million) . . . ."  (Compl't ¶ 132.)  Those allegations go toward actions that Michel undertook at the expense of SKW in order to benefit himself and entities controlled by a personal friend, but they do not go allege Michel's domination and control over a Speyside entity, including movants OPTA and Speyside Equity 1 LP.[2]

---

[2] MCGM's opposition memo appears to urge that because Michel executed certain agreements with Daugherty and others, the Complaint plausibly alleges alter ego status.  (Opp. Mem. at 26 ("Michel is a movant, an individual who separately joined with Daugherty, an individual, and other individuals and corporations.  Their names, individual and corporate, are in the contracts they signed.  They are co-conspirators in a conspiracy.").)  Without more, the assertion that various parties entered into one or more contract does not support the plausibility of alter ego status. MCGM also states that, contrary to the Complaint's allegations, "[a]lter ego is not the best phrase" and that the claim could instead be construed as sounding in conspiracy.  (Id.)

Because the Complaint does not plausibly allege an express promise or detrimental reliance, or that any Speyside-related entity was under the domination and control of Michel, the moving defendants' motion to dismiss Count Two will be granted.

IV.   THE COMPLAINT DOES NOT ALLEGE "CONVEYANCE
      WITHOUT CONSIDERATION."

Count Three is headed "Conveyance without Consideration against Speyside and/or OPTA," and asserts that "[c]onveyances by persons in business made without fair consideration is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business transaction without regard to his actual intent." (Compl't ¶ 144.) It states: "SKW AG or its subsidiaries and/or elements of SKW AG have been conveyed by or caused by Speyside Equity LLC from Munich by Speyside Equity LLC and/or to OPTA Group LLC New York or others, have been conveyed where no fair consideration was given to the Shareholders." (Compl't ¶ 145.)

Defendants state that "conveyance without consideration" is not a recognized as a cause of action under New York law. They note that in a pre-motion letter, MCGM cited to the now-superseded version of section 274 of the New York Debtor and Creditor Law that was in effect when Speyside acquired SKW in 2018. (ECF 54 at 3.) Section 274, at the time of the transaction, provided: "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent."  N.Y. Debt. & Cred. Law § 274 (2010).[3] The express terms of section 274 apply to claims by creditors. See, e.g., Lippe v. Bairnco Corp., 99

_____

[3] This version of section 274 was superseded, effective April 4, 2020. See id.

Fed. App'x 274, 281 (2d Cir. 2004) ("under the DCL, a transfer may not be challenged as fraudulent unless it prejudices the complaining creditor.") (collecting cases).

Neither the Complaint nor MCGM's opposition memo cites New York Debtor and Creditor Law.  MCGM emphasizes that OPTA acquired SKW and that Michel pursued the transaction without first seeking shareholder approval.  (Opp. Mem. at 27.)  As support for its claim, MCGM relies solely on Thyroff v. Nationwide Mutual Insurance Co., 8 N.Y.3d 283, 291-92 (2007), quoting the following passage: "The time to recognize conversion of intangible property 'has arrived': It cannot be seriously disputed that society's reliance on computers and electronic data is substantial, if not essential.  Computers and digital information are ubiquitous and pervade all aspects of business, financial and personal communication activities."  Thyroff concluded that "the tort of conversion must keep pace with the contemporary realities of widespread computer use."  Id. at 292.  Thyroff has no apparent bearing, however, on this claim of "conveyance without consideration."

The allegation about the underlying conveyance states that SKW was "conveyed by or caused by [Speyside] from Munich by [Speyside] and/or to [OPTA] New York or others . . . ." (Compl't ¶ 145.)  Generously construing this allegation in the light most favorable to MCGM, it appears to assert that Speyside conveyed SKW to OPTA "or others" without adequate consideration, leaving Speyside with inadequate capital for its creditors.  This allegation would go toward the conduct of Speyside and not OPTA or Speyside Equity 1 LP.

Further, MCGM states in its opposition that it "received no value for SKW Holding, and SKW Holding is liable for the damages."  (Opp. Mem. at 27.)  But SKW is not a defendant, and the Complaint does not plausibly allege why OPTA or Speyside Equity 1 LP should be liable for this claim.

Generously construing Count Three to be a claim brought under the New York Debtor and Creditor Law, the Complaint does not plausibly describe a violation of section 274 by OPTA or any other moving defendant.  The Complaint does not otherwise allege facts that plausibly state a claim for "conveyance without conversion."  The motion to dismiss Count Three will be granted.

## V.      THE CONVERSION CLAIM WILL BE DISMISSED

Count Four is headed "Conversion by OPTA Group LLC Against OPTA Group LLC," and asserts "[p]laintiff has good reason to believe that [SKW] was merged into OPTA Group LLC notwithstanding Defendants' claim that there was no merger."  (Compl't ¶ 148.) MCGM asserts that on July 1, 2022, it "demanded that OPTA (and all other Defendants) turn over all shares of stock and property to the Class because the rights of the Class Members are superior to any claims Speyside or OPTA Group may claim."  (Compl't ¶ 151.)  It asserts that OPTA now "controls the personal property" of SKW shareholders.  (Compl't ¶ 152.)

"A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession.  Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights."  Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 49-50 (2006) (internal citations omitted).

"An act which would otherwise constitute conversion is privileged when it is committed pursuant to a court order valid on its face."  Dexter v. Depository Tr. & Clearing Corp., 406 F. Supp. 2d 260, 265 (S.D.N.Y. 2005) (Lynch, J.) (citing Calamia v. City of New York, 879 F.2d 1025, 1031 (1989); Restatement (Second) of Torts § 266 (1965) ("One is

privileged to commit acts which would otherwise be . . . a conversion when he acts pursuant to a court order which is valid or fair on its face.")); <u>accord</u> <u>Weisman, Celler, Spett & Modlin v. Fein</u>, 225 A.D.2d 508, 508 (1st Dep't 1996) (conversion claim was properly dismissed when defendant acted pursuant to a court order).

The Complaint acknowledges that SKW's shares fell under the control of Speyside as a result of the German court's insolvency plan: "As a result of the insolvency plan, the Shareholders were replaced with Speyside, and/or a Speyside affiliate . . . ." (Compl't ¶ 24.) The insolvency plan confirmed by the German court required the transfer of shares to an entity called Speyside S.a.r.l.  (<u>See</u> ECF 65-1, -2.)  Speyside S.a.r.l. is not a defendant and is not referenced in the Complaint, and the allegations of how OPTA ultimately came to own the SKW shares are murky.  MCGM's opposition memo observes that the German court's decisions "cannot be appealed plus court [sic] did not allow the shareholders would [sic] defend themselves where its decision are and cannot be appealed." (Opp. Mem. at 29.)  It is nevertheless the case that MCGM asserts that it was harmed because OPTA, via Speyside, came to own the shares of SKW, and that those shares came under the control of a Speyside entity pursuant to the order of a German court.

Because the Complaint expressly acknowledges that "Speyside, and/or a Speyside affiliate" came to acquire MCGM's shares in SKW "[a]s a result of the insolvency plan," (Compl't ¶ 24) it does not plausibly allege a conversion claim against OPTA.

## VI.    THE STATUS OF THE REMAINING DEFENDANTS.

No appearance has been made on behalf of defendants Michel, Daugherty, Speyside Private Fund Advisers LLC and Speyside Private Fund LLP.  It is not apparent from the docket whether these defendants have been served with process.

Separately, in the portion of the Complaint that purports to allege the Court's personal jurisdiction over the defendants, SKW states as follows: "Each Defendant below purposefully availed him/itself of the privilege of conducting business in New York or is 'at home' in New York . . .  Michel lives in Germany beyond the jurisdiction of this federal court." (Compl't ¶ 53.)  This appears to be an acknowledgement that the Court does not have personal jurisdiction over defendant Michel.

Within 14 days, plaintiff shall file a letter-brief setting forth the date, time and circumstances of service of process on Michel, Daugherty, Speyside Private Fund Advisers LLC and Speyside Private Fund LLP, including compliance with Rules 4(*l*) and (m), Fed. R. Civ. P. Plaintiff shall also show cause in the same letter-brief why any defendant required to be served within the time limit set by Rule 4(m) but who has not been so served ought not be dismissed without prejudice.

CONCLUSION.

The motion to dismiss is GRANTED.  The Clerk is respectfully directed to terminate the motion and the related letter-motion.  (ECF 62, 86.)  Within 14 days, plaintiff shall file a letter-brief as directed above.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        March 21, 2024